CALLAWAY GOLF COMPANY,
Plaintiff,

v.

GOLF CLEAN, INC. d/b/a The Golf
Depot, and Golf Clean Interna-
tional, Inc., Defendants.

No. 95–989–CIV–T–24(A).

United States District Court,
M.D. Florida,
Tampa Division.

Aug. 8, 1995.

Steven L. Brannock, Stacy Delayne Blank, Holland & Knight, Tampa, FL, William C. Rooklidge, Matthew F. Weil, Howard, Rice, Nemerovski, Canady, Falk & Rabkin, Newport Beach, CA, for Callaway Golf Co.

Anne S. Mason, Mason & Associates, P.A., Clearwater, FL, for Golf Clean, Inc., Golf Clean International, Inc.

### ORDER

BUCKLEW, District Judge.

This Cause is before the Court on Plaintiff's Motion Requesting an Order to Show Cause as to a why preliminary injunction should not be issued against the Defendants (Doc. No. 2, filed June 26, 1995). This motion was referred to United States Magistrate Mark A. Pizzo on June 27, 1995, for a report and recommendation. Judge Pizzo filed his report on July 18, 1995 (Doc. No. 30), recommending that a preliminary injunction be issued.

All parties have been furnished copies of the Report and Recommendation and have been afforded an opportunity to file objections pursuant to 28 U.S.C. § 636(b)(1). No objections were filed by either party.

### District Court's Standard of Review

The motion was referred by this Court to Magistrate Judge Pizzo pursuant to 28 U.S.C. § 636(b)(1)(B). Accordingly, the applicable standard of review is a *de novo* determination of the portions of the report to which objections were made.

Accordingly, since no objections were filed, the Court adopts United States Magistrate Judge Pizzo's Report and Recommendation. Plaintiff's Motion Requesting an Order to Show Cause as to a why preliminary injunction should not be issued against the Defendants (Doc. No. 2, filed June 26, 1995) is **GRANTED.** A preliminary injunction is issued prohibiting the Defendants from:

(A) Manufacturing, producing, distributing, circulating, selling, offering for sale, importing, exporting, advertising, promoting, displaying, shipping, marketing, or otherwise disposing of "Canterbury Big Bursar Irons," "Professional Big Brother Tour" Irons, Big Bursar Iron heads, or Big Bursar Iron medallions;

(B) Manufacturing, producing, distributing, circulating, selling, offering for sale, importing, exporting, advertising, promoting, displaying, shipping, marketing, or otherwise disposing of any golf club iron head or club that:

1. Has a polished sole plate with a semi-circular relief facet; a heavy or wide top line with a peened or pebbled finish; a striking face with a peened finish, having horizontal score lines with the bottommost score line shortened and centered in the middle of the striking face, and the two bottom scorelines painted a contrasting color; and a large, straight cut rear cavity with a finish similar to that on the top line of the club head; substantially similar to the head on Callaway Golf's Big Bertha Irons as shown on Exhibit A; or

2. Has a medallion substantially similar to Callaway Golf's Big Bertha Irons medallion as shown on exhibit B;

(C) Using a trade dress confusingly similar to that of Callaway Golf's in the overall appearance of its Big Bertha Irons and/or in the appearance and shape of its Big Bertha Iron medallion in connection with the advertising, promotion, offering, marketing, manufacture, sale or other disposal of iron heads or irons;

(D) Using, manufacturing, producing, distributing, circulating, selling, offering for

sale, importing, exporting, advertising, promoting, displaying, shipping, marketing, or otherwise disposing of any iron heads, irons or other products or things (not manufactured by Callaway Golf) that bear any simulation, reproduction, counterfeit, copy or colorable imitation of Callaway Golf's Registered Trademarks, including the Callaway and Design Trademark (Registration No. 1,768,763) and the Big Bertha and Big Bertha and Design Trademarks (Nos. 1,649,164 and 1,720,466);

(E) Removing from any premises under their possession, custody or control, any goods or things bearing any simulation or colorable imitation of Callaway Golf's trade dress or Registered Trademarks;

(F) Disposing in any manner of any merchandise or thing in their possession, custody or control bearing any colorable imitation of Callaway Golf's trade dress or Registered Trademarks; and

(G) Disposing in any manner of any documents or other records evidencing the source or wholesale purchasers of the above-mentioned clubs, club heads or medallions.

**DONE AND ORDERED.**

*REPORT AND RECOMMENDATION*

PIZZO, United States Magistrate Judge.

Callaway Golf Company (Callaway), the manufacturer of "Big Bertha" woods and irons, claims that Defendants' golf clubs, "Canterbury Big Bursar Irons" and "Professional Big Brother Tour" irons, infringe upon Callaway's trademarks and trade dress in violation of the Lanham Act (15 U.S.C. § 1051 et seq.). Plaintiff asks the district court to preliminary enjoin Defendants from manufacturing, distributing, or selling these goods until the trial of the merits of the case. Based upon pleadings filed by Callaway, United States District Judge Susan C. Bucklew issued a temporary restraining order on June 27, 1995, prohibiting Defendants from marketing or selling its "Canterbury Big Bursar Irons" (doc. # 8). Judge Bucklew, pursuant to her authority under 28 U.S.C. § 636(b)(1)(B), referred Callaway's motion for preliminary injunction (doc. # 2) to the undersigned for a report and recommendation (doc. # 8). For the following reasons, I recommend that a preliminary injunction be issued against Defendants.

**I. The Rule 65 hearing and Defendant's "Professional Big Brother" Irons**

In accordance with Fed.R.Civ.P. 65(b) and Local Rule 4.06, this court convened a hearing on July 5, 1995, to review the merits of Callaway's request for preliminary injunction. Defendant, without admitting liability, agreed to cease and desist using any Big Bursar medallions in connection with the sale of any its golf equipment. However, this does not end the dispute. Instead, Defendants offered a replacement club called the "Professional Big Brother Tour," which Defendants argue is sufficiently dissimilar to Callaway's product as to not warrant an injunction. Callaway, unaware of the existence of this "new club" until just prior to the hearing, claimed that this product too infringed upon their trade dress. While this new club is not specifically addressed in Callaway's pleadings (all references are to the "Canterbury Big Bursar"), its characteristics and appearance are strikingly similar to its forbearer, the Big Bursar.[1] Because the issues presented by these new clubs are identical to those presented by Defendants' earlier model, this court concludes that this "counter offer" and Callaway's continuing complaint are ripe for review.[2]

**II. The Issue: Is Callaway's Big Bertha Iron Entitled to Trade Dress Protection?**

Callaway claims that the Canterbury Big Bursar violates its trademarks and trade

---

1. Callaway's complaint broadly asks that Defendants be permanently enjoined from using a trade dress confusingly similar to Callaway Golf's trade dress in the overall appearance of its Big Bertha Irons.

2. The parties provided the court an opportunity to inspect Callaway's Big Bertha Iron, Defendant's Canterbury Big Bursar and Professional Big Brother clubs, as well as irons made by other leading manufacturers. This court has also reviewed the affidavits attached to the pleadings in support and in opposition to the preliminary injunction. No additional evidence is needed to decide the issues before the court.

dress in violation of the Lanham Act. Defendants, without admitting liability, have agreed to cease and desist using any Canterbury Big Bursar medallions in connection with the sale of any of its golf equipment. Defendants also agree to be enjoined from marketing of selling any clubs by any technique which suggests a connection, affiliation or association with Plaintiff. Notwithstanding these concessions, Defendants are unwilling to acquiesce to Callaway's trade dress infringement claims. Defendants assert that Callaway cannot claim trade dress protection for the overall appearance of the Callaway Big Bertha irons, and that Defendants should be allowed to market and distribute its Professional Big Brother Tour irons as long as they do not bear the Canterbury Big Bursar medallion. Callaway steadfastly disagrees, and argues that the Professional Big Brother Tour is materially the same as the Big Bursar and its sale should be preliminarily enjoined.

### III. Factual Background

Golf Clean, Inc. is a small corporation which manufactures and markets a golf club and ball cleaning device called "Golf Clean". It also manufactures and sells a golf cooler called the "Cooler Caddy." [3] Golf Clean International, Inc., which does business as the Golf Depot, assembles, sells and distributes golf clubs through its two retail outlets as well as through other retailers. One of the products sold by Golf Clean International, Inc. is the Canterbury Big Bursar irons (this club is pictured at doc. 4, Helmstitter affidavit, exhibit D; it looks almost identical to Callaway's Big Bertha irons shown at doc. 4, Helmstitter affidavit, exhibit A).

Callaway Golf Company manufactures and markets high quality golf clubs. Callaway introduced its original Big Bertha golf club, the Big Bertha driver, in January 1991, and the Big Bertha fairway metal woods in 1992. The Big Bertha clubs have been extremely successful for Callaway; in fact Plaintiffs claim they are the best selling premium priced metal woods in the world. As a complement to its highly successful Big Bertha metal woods, Callaway developed a line of Big Bertha irons. These irons, which Callaway introduced into the market in early 1994, have been phenomenally successful and have generated more than $147 million in sales. In Florida alone, for example, Big Bertha irons sales exceed $14 million.

Callaway's marketing strategy is to design clubs that are "Demonstrably Superior and Pleasingly Different." Accordingly, the company emphasizes in its Big Bertha advertisements the shape and design of the irons, a design which Callaway promotes is in keeping with its successful Big Bertha wood. Callaway's Big Bertha irons possess the following features:

1. A wide top line with a peened finish similar to that on the striking face of the club;

2. A semicircular relief facet on the sole of the club;

3. A large, straight cut rear cavity;

4. The lowermost score lines on the striking face painted white with the bottom scoreline being shorter than the oters and centered under them;

5. Set in the rear cavity of the club head, the Big Bertha Irons medallion, which itself features:

 (a) a unique and distinctive shape and layout;

 (b) the federally registered Callaway logo appearing in an arched script;

 (c) the federally registered Big Bertha logo appearing in a flared rectangular box;

 (d) the "IRONS" designation in block writing on a colored background immediately below the Big Bertha logo; and,

 (e) a red black and silver color scheme.

---

**3.** Defendant submitted an affidavit by Golf Clean, Inc's president, Edward S. Mauro that indicates Golf Clean does not market, distribute, assemble, sell or otherwise conduct trade with respect to golf clubs, including the Canterbury Big Bursar Iron. However, due to Mr. Mauro's illness and subsequent inability to participate in expedited discovery as ordered by the district court, it is recommended that Golf Clean, Inc. also be preliminarily enjoined. This decision should not prejudice Golf Clean, Inc. because it states that it does not trade in the product that is the subject of the preliminary injunction.

The success of Callaway's clubs, both woods and irons, has resulted in a cottage industry of "knock off" clubs, and the company has vigorously attempted to protect her interests. Prior to this lawsuit, Callaway successfully obtained permanent injunctions in California and South Carolina against retailers and distributors of the Canterbury Big Bursar.[4]

Just like Callaway's Big Bertha irons, Defendants' Canterbury Big Bursar irons exhibit nearly identical features:

1. A wide top line with a smooth finish in contrast to the peened finish on the striking face of the club;

2. A semi circular relief facet on the sole of the club;

3. A large, straight cut rear cavity; and,

4. The lowermost score lines on the striking face painted white with the bottom score line being shorter than the others and centered under them.

This similarity is not happenstance. Prior to filing its papers in this case, Callaway telephonically ordered a set of "Canterbury Big Bursar" irons from Golf Depot in Clearwater, Florida. After inspecting these clubs, Callaway dispatched an investigator to visit one of Golf Depot's stores and masquerade as a customer for the Canterbury Big Bursar irons. A Golf Depot salesperson told this investigator that the Big Bursar irons were made "from the same molds used by Callaway."[5] Defendant's effort to copy Callaway's club includes matching the shape, script, color, and size of Callaway's Big Bertha medallion.

Although the Defendants have consented to entry of a permanent injunction as to the use of the Big Bursar medallions on any of their products, the Defendants seek to exclude from any injunction its "Professional Big Brother Tour" iron. This "new club" retains the shape and design features of Callaway's Big Bertha irons. Instead of the plastic medallion, the Professional Big Brother Tour has an embossed emblem inside the clubhead that is the exact shape of the Callaway medallion. In short, this new version is exactly the same as the Canterbury Big Bursar minus the medallion.[6]

## IV. Discussion

■ Before the district court can issue a preliminary injunction, Callaway must show: (1) a substantial likelihood of success on the merits (i.e. that Defendants have infringed on Callaway's trade dress and trademarks); (2) an irreparable injury if the injunction is not granted; (3) that Callaway's threatened injury outweighs the threatened harm the injunction may cause Defendants; and (4) the granting of the injunction will not disserve the public interest. *Cafe 207, Inc. v. St. Johns County*, 989 F.2d 1136 (11th Cir.1993). Of these four factors, the final three are demonstrably in favor of Callaway for reasons that are set forth below. Thus, the focus of the analysis is on the first factor, the likelihood of success on the merits of Callaway's claim of trade dress infringement.

### A. The Merits of the Case: Proving Trade Dress Infringement

■ Trade dress infringement is an implied federal cause of action based upon that portion of the Lanham Act which provides:

Any person who shall ... use in connection with any goods or services ... any false description or representation, including words or other symbols tending falsely to describe or represent the same, ... shall be liable to a civil action by ... any

---

4. See *Callaway Golf Company v. Joe Money, et al*, Case No. SACV95–0030 (C.D.Cal.1995) and *Callaway Golf Company v. Vern Green and Paulette Green d/b/a Old Golf Store*, Case No. 4:95–1173–22 (M.D.S.C.1995) (doc. 4, Rooklidge affidavit, exhibits B and C).

5. See doc. # 4, McRoberts affidavit. In their responsive affidavits, Defendants do not deny that one of their salespersons made such a representation.

6. The club presented by Defendants as the Professional Big Brother has a different shaft and grip than the Canterbury Big Bursar sold by Defendants. However, Callaway makes no claims that its shaft or grip contributes to its trade dress. Because Callaway's advertisements focus almost exclusively on the club head, and Defendants have failed to produce any evidence that Callaway has promoted its shaft or grip as part of its trade dress, the shaft and grip are insignificant in the trade dress analysis and are not considered any further.

person who believes that he is or likely to be damaged by the use of any such false description or representation.

Lanham Act § 43, 15 U.S.C. § 1125. See *John H. Harland Co. v. Clarke Checks, Inc.,* 711 F.2d 966, 980 (11th Cir.1983). The term "trade dress" refers to the total image of a product, and may include features such as size, shape, color combinations, texture, graphics, or even particular sales techniques. *Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 765, 112 S.Ct. 2753, 2755, 120 L.Ed.2d 615 (1992). To succeed on the merits of a trade dress infringement claim, Callaway must prove: (1) that its trade dress has a quality of inherent distinctiveness or has otherwise acquired secondary meaning in the marketplace; (2) that the features of the trade dress are primarily non-functional; and (3) that the trade dress of the products is confusingly similar. *AmBrit, Inc. v. Kraft, Inc.,* 812 F.2d 1531, 1535 (11th Cir.1986).

1. *Callaway's Big Bertha irons are inherently distinctive and have acquired secondary meaning.*

■ In evaluating the inherent distinctiveness of Callaway's trade dress, a court must consider: (1) whether it is a common, basic shape or design; (2) whether it is unique or unusual in a particular field; and (3) whether it is a mere refinement of a commonly adapted and well known form of ornamentation for a particular class of goods viewed by the public as a dress or ornamentation for the goods. *AmBrit, supra,* at 1536; *Brooks Shoe Mfg. Co., Inc. v. Suave Shoe Corp.,* 716 F.2d 854, 857–58 (11th Cir. 1983). If a product is inherently distinctive, secondary meaning need not be demonstrated. *Two Pesos,* 505 U.S. at 773, 112 S.Ct. at 2760.

■ The Callaway Big Bertha Iron's trade dress undeniably incorporates the common, basic shape and design of a golf club. As Defendant correctly points out, the cavity back design, a wide sole, and scoring on the club's face, are common features in golf clubs. However, trade dresses often use common lettering styles, geometric shapes, or colors. While each of these elements alone would not be inherently distinctive,

their combination and the total impression that the dress gives to the observer makes the item distinctive. *Paddington Corp. v. Attiki Importers & Distributors, Inc.,* 996 F.2d 577 (2nd Cir.1993). As the Eleventh Circuit said in *AmBrit,* "isolated or third party uses of various elements" of the [plaintiff's] trade dress do not detract from the distinctiveness of the overall impression of those elements of the [plaintiff's product]. *AmBrit,* at 1537.

The various ornamental and colorful designs of the Callaway Big Bertha Irons were deliberately chosen so as to produce a unique total image for the clubs. An image Callaway touts as "demonstrably superior and pleasingly different." Callaway adopted a "chunky" and "aggressive" wide top line for their club that is almost unique in the field (the Ping Zing club has a similar wide top line). The semicircular relief facet on the sole of the club is a distinctive design of this manufacturer. Added to these peculiar characteristics are the club's other features: namely the large, straight cut rear cavity, the distinguishing white lowermost score lines, and the unique Callaway medallion in the cavity's inset. All these components produce a distinctive club. Indeed, when Callaway introduced their Big Bertha irons in 1994 they looked noticeably different than any other club on the market. Much like the court's finding in *AmBrit,* "the record reveals no prior use of any combination of the [plaintiff's] trade dress elements that is at all similar to the unique impression conveyed by [their] trade dress." *AmBrit,* at 1537. Callaway's arbitrary combination of features makes their Big Bertha Irons inherently distinctive. See *Paddington Corp.,* 996 F.2d at 584.

■ Because Callaway's irons are inherently distinctive, secondary meaning need not be demonstrated. *Two Pesos,* 505 U.S. at 773, 112 S.Ct. at 2760. Nonetheless, the evidence indicates that the Callaway Big Bertha Irons have established secondary meaning. Secondary meaning is the connection the consuming public associates between the trade dress and the product's producer, whether that producer is known or unknown. *AmBrit,* 812 F.2d at 1535. Proof of inten-

tional copying is probative evidence on the secondary meaning issue. *Brooks Shoe Mfg. Co., Inc. v. Suave Shoe Corp.,* 716 F.2d 854 (11th Cir.1983).

A court should consider the following factors in assessing secondary meaning: (1) the length of time and manner of its use; (2) the nature and extent of its use; and (3) the efforts made in the direction of promoting a conscious connection, in the public's mind, between the mark and a particular source of origin. *Volkswagenwerk–Aktiengesellschaft v. Rickard,* 492 F.2d 474, 478 (5th Cir.1974); *Isaly Co. v. Kraft, Inc.,* 619 F.Supp. 983, 990 (M.D. Fla.1985); aff'd, *AmBrit, Inc. v. Kraft, Inc.,* 812 F.2d 1531 (11th Cir.1983).

Callaway has bombarded the golfing consumer with the image of its Big Bertha Clubs by spending over $5 million in advertising. Significantly, Callaway's ads and other promotional materials prominently feature the club head, thus emphasizing its unique and distinctive appearance. Callaway has sold over $147 million worth of the clubs, thereby establishing that the clubs are extremely popular amongst golfers. Numerous articles have been written profiling the development and success of the Callaway Big Bertha Irons. These facts, coupled with Defendant's nearly exact duplication of the Big Bertha and its representations that the Canterbury Big Bursar was made from the same molds as the Callaway Big Bertha, establish that the Big Bertha has acquired secondary meaning.

### 2. Callaway's trade dress is primarily nonfunctional.

Trade dress is protectable only if it is primarily nonfunctional. *AmBrit,* at 1537. Notwithstanding this requirement, individual elements of the trade dress can still be functional and the entire package still be protected under the Lanham Act. *AmBrit,* 812 F.2d at 1537. See also *John H. Harland,* 711 F.2d at 983. "In determining whether trade dress is primarily non-functional, the test is whether upholding an exclusive right to use the trade dress as a whole would hinder effective competition by others." Factors to consider are whether a

particular design is superior, whether there are alternative trade dress configurations available, and whether a particular design is comparatively simple or cheap. *Isaly Co. v. Kraft, Inc., supra,* at 991.

As discussed earlier, there are numerous clubs on the market that incorporate individual features of Callaway's trade dress. Hence, alternative trade dress configurations that serve the same function are available to competitors. Further, there is no evidence that Callaway's design is superior to that of other clubs, or that it is comparatively simple or cheap. Granting Callaway an exclusive right to use the Big Bertha trade dress will not hinder effective competition by others. Based upon *Isaly's* test, Callaway's trade dress is primarily nonfunctional.

### 3. Defendant's clubs are likely to be confused with the Callaway Big Bertha.

The primary factor in determining trade dress infringement under the Lanham Act is the likelihood of confusion resulting from the defendant's adoption of a trade dress similar to the plaintiff's. *AmBrit,* at 1537. The elements that must be considered to determine likelihood of confusion are: the strength of the trade dress, the similarity of design, the similarity of the product, the similarity of retail outlets and purchasers, the similarity of advertising media used, the defendant's intent, and actual confusion. The issue does not turn upon one party's position supporting a majority of these factors; instead, the court must evaluate the weight each factor deserves and then make its ultimate decision. The appropriate weight each factor should be given varies with each case. *Id.*

#### a. Strength of Trade Dress

As discussed above, Callaway's trade dress is strong; it has spent millions on advertising and placing the image in the golfing public's eye. Accordingly, for the same reasons that this Court determined that the trade dress is inherently distinctive and has acquired secondary meaning, the Callaway Big Bertha has a strong trade dress.

### b. The Similarity of Design

The similarity of design test is nothing more than a subjective eyeball test. *Exxon Corp. v. Texas Motor Exchange of Houston, Inc.*, 628 F.2d 500, 505 (5th Cir.1980); *Isaly*, 619 F.Supp. at 992. After eyeballing the clubs (even after a lengthy gaze), the Callaway Big Bertha and the Canterbury Big Bursar look almost exactly alike. The Professional Big Brother's design copies Callaway's club, even with Defendants' change in logo. Hence, this factor weighs heavily in Callaway's favor.

### c. Similarity of Retail Outlets and Purchasers

The possibility of confusion is greater when products have similar trade channels and predominant consumers. *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252 (5th Cir.1980). Callaway clubs are sold at off-course retail golf shops. Defendants sell their clubs at their own retail stores as well as to other off-course golf shops. Defendants' employee admits to having sold customers Big Bertha clubs at defendant's store.[7] Thus, the trade channels must necessarily be similar if both clubs are being sold at Defendant's store.

### d. Similarity of Advertising Media

Callaway advertises its clubs in various golf related print media and general circulation publications, as well as on television and through professional golfer endorsements. There is no evidence that Defendants use any of these media to advertise their product. Because Callaway bears the burden of proof for its motion, this factor must be weighed in favor of Defendants.

### e. Defendants' Intent

If a plaintiff can show that a defendant adopted a mark with the intent of deriving benefit from the reputation of the plaintiff, that fact alone may be sufficient to justify an inference that there·is confusing similarity.

*Exxon Corp., supra* at 506. Proof of Defendants' intent of deriving benefit from the Plaintiff's reputation is significant. Callaway's affidavit demonstrates that Defendant marketed the Big Bursars clubs as Callaway copies even to the extent as to suggest they were manufactured from the same molds. In this case, imitation is the sincerest form of flattery.

### f. Actual Confusion

"Although evidence of actual confusion is not necessary to a finding of likelihood of confusion, it is nevertheless the best evidence of likelihood of confusion." *John H. Harland*, 711 F.2d at 978, quoting *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d at 263. Survey evidence is not afforded much weight in determining actual confusion, but it can nonetheless be probative on the issue. *Am-Brit, supra*, at 1544. In December 1994, Callaway commissioned a survey of potential customers or users of the Callaway Big Bertha and the Canterbury Big Bursar. The survey pool consisted of 200 golfers interviewed at public golf courses which had both a driving range and a pro shop. Fifty golfers were interviewed in four different market areas: Atlanta, Georgia; Phoenix, Arizona; Tampa, Florida; and Southern California. Interviewees were shown the Canterbury Big Bursar and asked questions about what company the interviewee believed made or distributed the club. The survey indicated that 36% of those surveyed mistakenly believed that the Canterbury Big Bursar golf club was made by and/or associated with Callaway.

Defendants argue that this survey has no bearing on the issues in this case because it has agreed not to sell the Canterbury Big Bursar. However, because this court finds that Defendant's proposed Professional Big Brother is substantially the same as the Canterbury Big Bursar, it finds Defendant's argument without merit. Callaway's survey, although not dispositive on the issue of actual

---

**7.** Defendant's salesman, Don Murphy, states in his affidavit "From time to time I have sold Big Bertha clubs to customers of the Golf Depot and I am familiar with certain features of the Big Bertha clubs." (doc. 19). The Court interprets this statement to mean that the clubs were sold *at* Golf Depot. Even if this conclusion is incorrect, it is clear that Golf Depot has customers that purchase both the Callaway and the Canterbury products.

confusion, suggests that discovery in this case may well reveal more evidence of actual confusion.

### g. Callaway has Demonstrated Likelihood of Confusion

■ In summary, Callaway has adequately demonstrated the factors necessary for a finding of likelihood of confusion. As discussed above, Callaway's trade dress is fairly strong, defendants' clubs are nearly identical to the Callaway Big Bertha, the products are sold in similar retail outlets, Defendants' affirmatively intended to misrepresent its product as materially the same as Callaway's, and there is at least some indication of actual confusion. These factors weigh heavily in favor of a conclusion that Callaway has established a likelihood of confusion. To the extent that any factors support Defendants position, those factors, when weighed as a whole, are insufficient to overcome this court's conclusion that Callaway has established a likelihood of confusion.

### h. Miscellaneous Issues

At the hearing on this matter, Defendants' urged this court to follow the line of reasoning suggested by *Calvin Klein Cosmetics Corp. v. Parfums de Coeur Ltd.*, 824 F.2d 665 (8th Cir.1987) and *Conopco, Inc. v. May Dept. Stores Co.*, 46 F.3d 1556 (Fed.Cir.1994). However, the facts in those cases are distinguishable from the facts here because they involved defendants who affirmatively acknowledged that their products were similar to a nationally known brand and asked the consumer to compare its product with the national product. In this case, Defendants misrepresented that their clubs were cast from the same molds as Callaway's and otherwise attempted to represent that its clubs and Callaway's were made by the same manufacturer. Accordingly, the analysis applied in *Calvin Klein* and *Conopco* is factually distinguishable and has no application to the issues before this court.

### V. Conclusion

■ The Callaway Big Bertha arbitrarily combines its features in such a manner that the clubs are inherently distinctive; further,

the clubs have acquired secondary meaning. The features claimed by Callaway as its trade dress are primarily nonfunctional. Finally, Defendants' product is confusingly similar to the Callaway Big Bertha and is likely to be confused by the end user as having some connection to Callaway. This court concludes that Callaway has demonstrated it will likely succeed on the merits of its claim.

In addition to demonstrating it is likely to succeed on the merits, Callaway has established the other factors necessary for issuance of a preliminary injunction as well. "In trademark infringement cases, irreparable harm is presumed." *Caterpillar Inc. v. Nationwide Equipment*, 877 F.Supp. 611 (M.D.Fla.1994). The same principle is true in unfair competition claims. *Vision Sports, Inc. v. Melville Corp.* 888 F.2d 609 (9th Cir. 1989). Callaway will suffer irreparable harm if the preliminary injunction is not issued.

A preliminary injunction will not cause Defendants' to suffer any legitimate harm, because they are simply being prevented from selling a product that they are not legally entitled to sell. See *Caterpillar*, 877 F.Supp. at 617. Callaway faces the risk of injury to its business relationships, reputation and good will; in comparison, Defendants will suffer little. This court is substantially convinced that the balance of the equities weighs heavily in favor of Callaway, and that the public interest will not be disserved by the granting of a preliminary injunction in this case.

**ACCORDINGLY, IT IS HEREBY RECOMMENDED** that a preliminary injunction be issued prohibiting Defendants from:

(A) Manufacturing, producing, distributing, circulating, selling, offering for sale, importing, exporting, advertising, promoting, displaying, shipping, marketing, or otherwise disposing of "Canterbury Big Bursar Irons," "Professional Big Brother Tour" irons, Big Bursar Iron heads, or Big Bursar Iron medallions;

(B) Manufacturing, producing, distributing, circulating, selling, offering for sale, importing, exporting, advertising, promoting, displaying, shipping, marketing, or

otherwise disposing of any golf club iron head or club that:

1. Has a polished sole plate with a semi-circular relief facet; a heavy or wide top line with a peened or pebbled finish; a striking face with a peened finish, having horizontal score lines with the bottommost score line shortened and centered in the middle of the striking face, and the two bottom scorelines painted a contrasting color; and a large, straight cut rear cavity with a finish similar to that on the top line of the club head; substantially similar to the head on Callaway Golf's Big Bertha Irons as shown on Exhibit A; or

2. Has a medallion substantially similar to Callaway Golf's Big Bertha Irons medallion as shown on Exhibit B;

(C) Using a trade dress confusingly similar to that of Callaway Golf's in the overall appearance of its Big Bertha Irons and/or in the appearance and shape of its Big Bertha Iron medallion in connection with the advertising, promotion, offering, marketing, manufacture, sale or other disposal of iron heads or irons;

(D) Using, manufacturing, producing, distributing, circulating, selling, offering for sale, importing, exporting, advertising, promoting, displaying, shipping, marketing, or otherwise disposing of any iron heads, irons or other products or things (not manufactured by Callaway Golf) that bear any simulation, reproduction, counterfeit, copy or colorable imitation of Callaway Golf's Registered Trademarks, including the Callaway and Design Trademark (Registration No. 1,768,763) and the Big Bertha and Big Bertha and Design Trademarks (Nos. 1,649,164 and 1,720,466);

(E) Removing from any premises under their possession, custody or control, any goods or things bearing any simulation or colorable imitation of Callaway Golf's trade dress or Registered Trademarks;

(F) Disposing in any manner of any merchandise or thing in their possession, custody or control bearing any colorable imitation of Callaway Golf's trade dress or Registered Trademarks; and

(G) Disposing in any manner of any documents or other records evidencing the source or wholesale purchasers of the above-mentioned clubs, club heads or medallions.

**IT IS SO RECOMMENDED** this 18th day of July, 1995.

EXHIBIT A